# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| S. A. N., ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | **NO. 13-30006-DHH** |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner, ) | |
| Social Security Administration, ) | |
|         Defendant. ) | |

## DECISION

### September 23, 2014

Hennessy, M.J.

      The Plaintiff, S.A.N., seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #11). The Commissioner seeks an order affirming her decision. (Docket #16). These matters are now ripe for adjudication.

      For the reasons that follow, Plaintiff's Motion for Judgment on the Pleadings (Docket #11) is DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #16) is ALLOWED.

---

[1] Under Fed. R. Civ. P. 25(d), as of February 14, 2013, Carolyn W. Colvin is substituted for Michael J. Astrue, the former Commissioner of the Social Security Administration.

I.  BACKGROUND

A.  Procedural History

On April 9, 2010, an application for SSI was filed on behalf of S.A.N., a child under age eighteen, alleging a disability onset date of December 1, 2009. (Tr. 104). The application was initially denied on June 30, 2010. (Tr. 49). S.A.N. filed a request for reconsideration, which was denied on October 28, 2010. (Tr. 54). Pursuant to S.A.N.'s request, a hearing was held before an ALJ on October 25, 2011. (Tr. 27, 57). S.A.N., represented by counsel, and her mother appeared, with S.A.N.'s mother providing testimony. (Tr. 29). After the hearing, on October 28, 2011, a psychological evaluation was received into the record. (Tr. 11, 285-90). On December 8, 2011, the ALJ rendered a decision unfavorable to S.A.N, finding that S.A.N. had not been disabled since April 9, 2010. (Tr. 8, 23).

On February 1, 2012, S.A.N. filed a request for review of the ALJ'S decision. (Tr. 7). On November 9, 2012, the Appeals Council denied S.A.N.'s request for review. (Tr. 1). Having timely pursued and exhausted her administrative remedies before the Commissioner, S.A.N. filed a Complaint in this Court on January 9, 2013, pursuant to 42 U.S.C. § 405(g). (Docket #1). S.A.N. filed a Motion for Judgment on the Pleadings on May 23, 2013 (Docket #11), and the Commissioner filed a cross-motion on August 14, 2013 (Docket #16).

B.  Medical and Personal History

On March 4, 2009, S.A.N. was referred to Valley Psychiatric Service for psychological testing to help assess her cognitive, emotional, and behavioral functioning. (Tr. 169, 176). The referral was made due to concerns about S.A.N.'s fights with her brother, talking back, inability to sit still, poor appetite, and poor sleep. (Tr. 173, 176). On April 8, 2009, S.A.N. was diagnosed by Thomas Rollend, Licensed Marriage and Family Therapist, with oppositional

defiance disorder and parent-child relationship problems. (Tr. 164, 174-75). Rollend assigned S.A.N. a Global Assessment of Functioning ("GAF") score of 50.[2] (Tr. 175).

On April 27, 2009, S.A.N. was examined by Dr. Nancy M. Kloczko as part of a well-child visit. (Tr. 160). Dr. Kloczko noted that S.A.N. was healthy, growing and developing normally, and her asthma was well-controlled. (Tr. 161). Dr. Kloczko observed that S.A.N. was seeing a therapist for hyperactive behavior and sleep problems. (Tr. 160). Dr. Kloczko noted that S.A.N. was able to play well with her peers and had no behavioral or academic issues in pre-school. (Id.).

On December 2, 2009, Dr. Daniel Chapelle, licensed clinical psychologist at Valley Psychiatric Service, completed a psychological evaluation of S.A.N, diagnosing her with oppositional defiant disorder, dysthymic disorder, and rule out adjustment disorder with mixed disturbance of emotions and conduct. (Tr. 180). Dr. Chapelle also diagnosed S.A.N. with rule out attention deficit hyperactivity disorder ("ADHD"). (Tr. 181). However, Dr. Chapelle stated that, while S.A.N.'s "behavior presentation during testing suggested a vulnerability for motoric overactivity (restlessness and/or needing to be constantly in motion) her actual test performance seems to suggest average attentional and concentration skills." (Id.). Dr. Chapelle observed that S.A.N. was "virtually constantly in motion, with a great deal of wiggling and squirming in her chair," but "her attention per se was generally good and sustained, and she remained in or near her seat for the entire duration of testing without any kind of walking away from the testing desk." (Tr. 177-78). Dr. Chapelle stated that "both test findings and test behavior seem to argue against a diagnosis of attentional deficit," (Tr. 179), but suggested that it would be helpful to ask

---

[2] A GAF score of 50 indicates "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 1994).

3

two or three of S.A.N.'s teachers to complete an ADHD questionnaire to further assess the possibility of ADHD (Tr. 181).

On March 2, 2010, S.A.N. was examined by Lynda LaFountain, an advanced practice registered nurse, at Valley Psychiatric Service. (Tr. 166). LaFountain observed that S.A.N.'s mood and affect were bright and engaging and that she was mildly to moderately restless and fidgety. (Tr. 167). LaFountain stated that S.A.N. "[r]equired redirection in regards to poor boundaries and being interruptive but was able to respond to the redirection." (Id.). LaFountain also observed that S.A.N. exhibited some aggression towards others. (Id.). LaFountain identified diagnoses of oppositional defiant disorder and rule out ADHD. (Id.). S.A.N. was assigned a GAF score of 55.[3,4] (Id.). LaFountain placed S.A.N. on Clonidine for irregular sleep. (Tr. 168). On April 5, 2010, LaFountain switched S.A.N.'s medication to Remeron. (Tr. 165).

On May 6, 2010, at an appointment with LaFountain, S.A.N.'s mother reported that S.A.N. was sleeping well on the Remeron although she continued to get up once a night. (Tr. 201). S.A.N.'s mother also reported concerns over S.A.N.'s behavioral issues. (Id.). S.A.N.'s mother reported that S.A.N. had "meltdowns," threw fits, broke a window at one point, had shown some fire-setting behaviors, and continued to be aggressive towards others. (Id.). LaFountain opined that S.A.N.'s affinity for rough play and loud noises could be due to sensory issues and/or behavioral issues as "[h]er checklist came back almost nonexistent for symptoms of ADHD." (Id.). LaFountain referred S.A.N. for sensory evaluation at Weldon Rehabilitation ("Weldon") and placed S.A.N. on the Clonidine patch to help calm some of her behaviors. (Tr.

---

[3] A GAF score of 55 indicates "moderate" (and not serious) symptoms or difficulty in social, occupational, or school functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 1994).

[4] S.A.N.'s brief mistakenly states that LaFountain assigned her a GAF score of 50. (Docket #12 at 9).

4

201, 228). That same day, S.A.N. was evaluated by Weldon for outpatient occupational therapy. (Tr. 228).

On June 30, 2010, Dr. Aaron Leavitt, a Valley Psychiatric Service psychiatrist, completed a Social Security disability evaluation of S.A.N. (Tr. 189-91). Dr. Leavitt had last examined S.A.N. on June 2, 2010, and also referred to Dr. Chapelle's testing on December 2, 2009 as support for his conclusions. (Tr. 189). Dr. Leavitt stated S.A.N.'s diagnosis as oppositional defiant disorder and dysthymic disorder. (Tr. 190). He noted no problems with S.A.N.'s communication or motor skills, "although she refuses to do what she was instructed to do and needed to be redirected." (Tr. 189-90). He stated that S.A.N. was emotional, sensitive, clingy, and had no friends. (Tr. 191). He also noted that S.AN. yells at and is aggressive with her peers. (Id.). Dr. Leavitt stated that S.A.N. needed constant supervision with tasks such as homework, dressing, and eating, and that she had difficulty focusing on one thing. (Id.).

S.A.N. began treatment with Weldon on July 13, 2010. (Tr. 228-32). S.A.N.'s mother told the staff that S.A.N. was in constant motion and was always getting in trouble at home and in school because she cannot sit still. (Tr. 231). S.A.N.'s mother further reported that S.A.N. has a few friends at school, but often has difficulty keeping friends because she can be bossy and will fight with her friends. (Id.). Progress notes made during the treatment with Weldon reported that S.A.N. behaved and interacted well and she worked attentively on all assigned projects despite some occasional signs of impulsivity. (Tr. 216, 218, 220, 222, 224, 226, 229).

At her August 10, 2010 appointment, LaFontain noted that S.A.N. "appears to do better in school for the most part, it's home that are the major issues." (Tr. 199). LaFontain recommended Tenex as a medication to help with S.A.N.'s behavioral issues. (Id.). LaFontain observed that S.A.N. was well-rested. (Id.). At an appointment on September 3, 2010,

LaFontain observed that S.A.N was "somewhat energetic and very active during the visit, but she responds very well to redirection." (Tr. 212). S.A.N.'s mother stated that S.A.N.'s behavior is "very hyperactive and that she seems scattered and distractible." (Id.). LaFontain observed that S.A.N. was well-rested. (Id.). LaFontain discontinued treatment with Remeron and decided to just continue S.A.N. on Tenex. (Id.).

At a November 3, 2010 well-child appointment, S.A.N.'s pediatrician, Dr. Peter Blier, observed that S.A.N. slept through the night and had no problems with sleep onset after starting medications. (Tr. 252). Dr. Blier also observed that S.A.N. liked to read, attended school regularly, had no academic or behavioral problems at school, and was able to make and keep friendships although she was very anxious and sad most of the time. (Id.).

On January 27, 2011, Rina Irizarry, a social worker at Valley Psychiatric Service, completed the "Identifying Children/Adolescents with Serious Emotional Disturbances" form with respect to S.A.N. (Tr. 265-81). Irizarry reported that S.A.N. did not have an inability to build or maintain satisfactory interpersonal relationships with peers and teachers, nor did she exhibit inappropriate types of behavior or feelings under normal circumstances. (Tr. 266). Irizarry did report that S.A.N. experienced a general pervasive mood of unhappiness or depression; however, she found no tendency to develop physical symptoms or fears associated with personal or school problems. (Id.). Irizarry assigned S.A.N. a GAF of 55.[5] (Tr. 280).

Dr. Chapelle evaluated S.A.N. for a second time on August 11, 2011. (Tr. 286-90). Dr. Chapelle noted a discrepancy between S.A.N.'s behavior at home, where she was reported as disruptive, hyperactive, argumentative, and disrespectful, versus that at school, where she was

---

[5] At page 262 and 263 of the Transcript, there is an evaluation form titled "Massachusetts Child and Adolescent Need and Strengths" that assigns a GAF score of 50 to S.A.N. (Tr. 262-63). The form is included in an exhibit containing evidence dated from November 12, 2010 to May 18, 2011, but there is no precise date on the form. The assessment was completed by Irizarry. (Tr. 262).

6

seen as sweet, shy, quiet, and respectful. (Tr. 286). Dr. Chapelle found S.A.N. to be alert, oriented, cooperative, motivated to perform up to potential, and earnest, but somewhat subdued. (Tr. 287). Dr. Chapelle noted that SA.N. was appropriate behaviorally, there was zero over-activity, and her attention was good and sustained. (Id.). Testing suggested that S.A.N.'s overall level of intellectual functioning was in the low average to average range, with weaker performance on verbal skills. (Tr. 288). Emotionally, S.A.N. had indications of pronounced depression, which appeared to be chronic and pervasive. (Tr. 288-89). However, Dr. Chapelle stated that, compared to the last evaluation, S.A.N. seemed to have developed "a little bit more tolerance for affect, and perhaps also a little bit more ability to recognize and identify some of her internal emotional experiences." (Tr. 289). Dr. Chapelle assigned S.A.N. a GAF score of 55. (Tr. 290).

On May 10, 2012, Maura Cummings, S.A.N.'s kindergarten teacher completed a teacher questionnaire. (Tr. 141-49). Ms. Cummings reported no problems in the various functional areas relevant to S.A.N.'s disability application. (Id.). Ms. Cummings noted that the problem behaviors that S.A.N.'s mother reported at home were not observed at school. (Tr. 148).

C.      State Agency Opinions

On June 29, 2010, Dr. Celeste Derecho, a state agency psychologist, completed a childhood disability evaluation form with respect to S.A.N. (Tr. 182-87). Dr. Derecho concluded that S.A.N.'s records showed less than marked limitations in attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. 184-85). Dr. Derecho did not find limitations in any of the other domains. (Id.).

On October 22, 2010, Dr. Bruce Lipetz, a state agency psychologist, also completed a childhood disability evaluation form with respect to S.A.N. (Tr. 204-10). Dr. Lipetz reached

7

similar conclusions to those of Dr. Derecho based on his review of updated records. He found that S.A.N.'s records showed less than marked limitations in attending and completing tasks, interacting and relating with others, and caring for oneself; he found no limitations in the other domains. (Tr. 206-07). Dr. Lipetz remarked that "[i]t makes no sense that the child cannot sit still at home, yells, fights with other (other than her brother which does not appear unusual for siblings) and has no problems at school." (Tr. 209). "The child appears anxious while at home but not at school." (Tr. 210). Dr. Lipetz noted "significant inconsistencies in this record with regard to the family situation and level of family conflict, the child's varied reported symptoms by the mother and the inconsistent behavior at home and school." (Tr. 209). Dr. Lipetz concluded that "[t]he claimant's treating sources have yet to understand the discrepancy though they are apparently somewhat aware of the discrepancy." (Tr. 209-10).

D.  ALJ Hearing

At the time of the ALJ hearing, on October 25, 2011, S.A.N. was eight years old and in the second grade.[6] (Tr. 104, 287). She attends the Boys and Girls club after school until 5:45. (Tr. 36). S.A.N. lives with her mother, her older brother, and her younger sister, and her father stays with the family on weekends. (Tr. 31).

At the hearing, S.A.N.'s mother testified that S.A.N. is constantly trying to hit her mother and her younger three-year-old sister. (Tr. 31). She also testified that S.A.N. pushed a neighbor's child down the stairs and is verbally abusive to other children. (Id.). S.A.N.'s mother stated that S.A.N. does not have friends in school or outside of school. (Tr. 39).

---

[6] In the memorandum in support of her motion, S.A.N. states that she was in kindergarten at Liberty School at the time of the ALJ hearing, citing a Disability Report listing her as attending kindergarten. (Docket #12 at 2; Tr. 118). The report is undated. (Tr. 114-21). From the context of that report, it is evident that it was completed well prior to the hearing.

8

S.A.N.'s mother testified that S.A.N. has obsessive compulsive disorder ("OCD"), which has resulted in sensory problems. (Tr. 38). S.AN.'s mother stated that S.A.N. will "freak out" if water lands in her face while being bathed. (Id.). S.A.N.'s mother observed that, when shopping, S.A.N. will have to check the aisles to ensure that everything is in its proper place. (Id.). She further stated that S.A.N. has to re-set the table if it is not done in a certain way. (Id.).

S.A.N.'s mother reported that S.A.N. takes medication for sleep at night. (Tr. 37). S.A.N.'s mother stated that, if she does not take the medication, S.A.N. will still fall asleep, but will get up around three or four in the morning and sometimes will not go back to sleep. (Id.). S.A.N.'s mother testified that S.A.N. looks tired and angry in the morning when she wakes up. (Tr. 38).

S.A.N.'s mother also testified that S.A.N. suffers from an infection in both eyes that causes significant swelling and redness. (Tr. 40). S.A.N.'s mother testified that S.A.N. suffers outbreaks of these infections approximately four to six times a year. (Id.). S.A.N.'s mother stated that S.A.N. is supposed to wear glasses for this condition, but S.A.N. broke her glasses intentionally. (Tr. 40-41). S.A.N.'s mother noted that S.A.N.'s doctor stated that S.A.N. would need eye surgery within the year if she continued to refuse to wear glasses. (Id.).

S.A.N.'s mother stated that S.A.N. is in counseling both in school and out of school. (Tr. 35). The counseling in school takes place once a week. (Id.). The counseling outside of school takes place at home visits once a week. (Id.). S.A.N. also sees a psychiatrist every two months. (Id.).

E.  Administrative Decision

In assessing S.A.N.'s request for benefits, the ALJ conducted the three-step sequential evaluation process that determines whether an individual under the age of eighteen is disabled

and thus entitled to benefits. See 20 C.F.R. § 416.924(a). In conducting this analysis, the ALJ considers "all relevant information" in the claimant's case record, which "may include information from medical sources and nonmedical sources, such as [the claimant's] pediatrician, other physician, psychologist, or qualified speech-language pathologist; other medical sources . . . such as physical, occupational, and rehabilitation therapists; and nonmedical sources, such as [the claimant's] parents, teachers, and other people who know [the claimant]. 20 C.F.R. § 416.924a(a).

First, the ALJ considers the claimant's work activity and determines whether he or she is doing "substantial gainful activity." 20 C.F.R. § 416.924(b). The ALJ found that S.A.N. had not engaged in substantial gainful activity since April 9, 2010. (Tr. 14).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 416.924(a), (c). The ALJ determined that S. A. N. had the severe impairments of oppositional defiant disorder and dysthymic disorder. (Tr. 14).

Third, the ALJ must determine whether the claimant has impairments that meet, are the medical equivalent to, or functionally equal an impairment listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 416.924(d). If the claimant has an impairment that meets, medically equals, or functionally equals the requirements of one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. 20 C.F.R. § 416.924(d)(1). The ALJ found that S.A.N. did not have an impairment or combination of impairments meeting, medically equivalent to, or functionally equal to an Appendix 1 impairment. (Tr. 15). Accordingly, the ALJ found that S.A.N. was not disabled since April 9, 2010. (Tr. 23).

## II. STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).

## III. ANALYSIS

At the third step of the disability evaluation process, the ALJ must determine whether the claimant has impairments that meet, medically equal, or functionally equal an impairment listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 416.924(d). In determining whether an impairment or combination of impairments functionally equals the listings, the ALJ must assess the claimant's function in terms of six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). In making this assessment, the ALJ must compare how "appropriately, effectively, and independently" the claimant performs activities compared to the performance of other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b). An impairment or combination of impairments functionally equals the

listings if the impairment or combination of impairments results in "marked" limitations in two domains of function or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

The regulations provide claimants with the following definition of a "marked" limitation:

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limit only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

. . .

(iii) If you are a child of any age (birth to the attainment of age 18) we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2). An ALJ will find that a claimant has an "extreme" limitation in a domain when the claimant's impairment or combination of impairments "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning [the ALJ] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

The ALJ determined that S.A.N. does not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 15). S.A.N. argues that the ALJ's conclusion of a less than marked limitation in the domain of attending and completing tasks and in the domain of interacting and relating with others is not supported by substantial evidence. (Docket #12 at 6-16).

A.   Attending and Completing Tasks

In the attending and completing tasks domain, the ALJ considers "how well you[, i.e., the claimant,] are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). In assessing this domain, the ALJ also considers "the child's ability to change focus after completing a task and to avoid impulsive thinking and acting" as well as the ability to prioritize competing tasks and manage her time. SSR 09-4p.

Social Security rules provide the following age group descriptor for a school-age child, defined as age six to attainment of age twelve, without an impairment:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv). The rules also set forth some examples of limited function in this domain that children of different ages might have. 20 C.F.R. § 416.926a(h)(3). These include:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements or touch.
>
> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
>
> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

13

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3)(i)-(v).

The ALJ found that in light of S.A.N.'s "ability to attend and concentrate at school (i.e., with no contraindications from her teachers), as well as basically good attention with testing," S.A.N. has less than marked limitation in the domain of attending and completing tasks. (Tr. 18-19).

As noted previously, the Court's function is a narrow one, limited to addressing whether the evidentiary standard is met and whether the determination conformed to statutory requirements. Ward, 211 F.3d at 655. Here that standard is met. The ALJ's statement that she relied on the entire record is supported by her thorough recitation of the medical evidence and other evidence, her evaluation of the evidence, and her assignment of weights to the testimony and evidence before her.

There is substantial evidence in the record to support the ALJ's conclusion that S.A.N. had a less than marked limitation in the domain of attending and completing tasks. S.A.N.'s school record reveals that she attended school regularly in a regular classroom with no additional services and had no behavioral or academic issues in pre-school or in kindergarten. (Tr. 41, 148, 160, 252). A questionnaire completed by S.A.N.'s kindergarten teacher specifically reports no problems in this domain. (Tr. 148). Additionally, there is ample medical evidence to substantiate the ALJ's finding. Pursuant to his evaluation of S.A.N. on December 2, 2009, Dr. Chapelle found that, while S.A.N's "behavior presentation during testing suggested a vulnerability for motoric overactivity (restlessness and/or needing to be constantly in motion) her

14

actual test performance seems to suggest average attentional and concentration skills." (Tr. 181). Dr. Chapelle concluded that "both test findings and test behavior seem to argue against a diagnosis of attentional deficit." (Tr. 179). On May 6, 2010, LaFountain noted that S.A.N.'s "checklist came back almost nonexistent for symptoms of ADHD." (Tr. 201). Treatment notes from Weldon indicate that S.A.N. worked attentively on all assigned projects despite some occasional signs of impulsivity. (Tr. 216, 218, 220, 222, 224, 226, 229). On August 11, 2011, Dr. Chapelle found S.A.N. appropriate behaviorally with zero over-activity and good and sustained attention. (Tr. 287). Testing at that time suggested that S.A.N.'s overall level of intellectual functioning was in the low average to average range. (Tr. 288).

The ALJ concurred with the state agency examiner's findings that S.A.N.'s records showed less than marked limitation in attending and completing tasks, agreeing that there were "significant inconsistencies with regard to the family situation and level of family conflict, the child's varied reported symptoms by the mother and inconsistent behavior at home and school." See 20 C.F.R. § 416.927(e) (treating evidence from nonexamining sources as opinion evidence). The ALJ ultimately found that the evidence did not support S.A.N.'s allegations, particularly those testified to by S.A.N.'s mother. The ALJ's weighing of the evidence will not be revisited by the Court here. To the extent there are conflicts in the record evidence – particularly between the testimony of S.A.N.'s mother and testimony concerning S.A.N.'s behavior at school – it is up to the ALJ, not this Court, to resolve such issues. Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001) ("[T]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."). Though the ALJ's determination may be based on a record that contains conflicting evidence, the resolution of any evidentiary conflicts remains the responsibility of the Commissioner. 42 U.S.C. § 405(g).

B.   Interacting and Relating With Others

In the interacting and relating with others domain, the ALJ considers "how well you [the claimant] initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). "This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community." SSR 09-5p. "[B]ecause communication is essential to both interacting and relating, [the ALJ] consider[s] in this domain the speech and language skills children need to speak intelligibly and to understand and use the language of their community." Id.

Social Security rules provide the following age group descriptor for a school-age child, defined as age six to attainment of age twelve, without an impairment:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). The rules also set forth some examples of limited function in this domain that children of different ages might have. 20 C.F.R. § 416.926a(i)(3). These include:

> (i) You do not reach out to be picked up and held by your caregiver.
>
> (ii) You have no close friends, or your friends are all older or younger than you.
>
> (iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
>
> (iv) You have difficulty playing games or sports with rules.
>
> (v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.

(vi) You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. § 416.026a(i)(3)(i)-(vi).

The ALJ found that, although S.A.N. "may have some difficulties maintaining social relationships in the home setting, she is able to adequately interact at school and with medical sources, and, therefore, S.A.N. has less than marked limitation in the domain of interacting and relating with others. (Tr. 15-16).

The Court finds that there is also substantial evidence in the record to support the ALJ'S conclusion that S.A.N. had a less than marked limitation in the domain of interacting and relating with others. The ALJ's statement that she relied on the entire record is supported by her thorough recitation of the medical evidence and other evidence, her evaluation of the evidence, and her assignment of weights to the testimony and evidence before her.

S.A.N.'s school record reveals that she attended school regularly in a regular classroom with no additional services, was able to play well with her peers and make and keep friendships, built and maintained satisfactory interpersonal relationships with teachers, and had no behavioral or academic issues in pre-school or in kindergarten. (Tr. 41, 148, 160, 252, 266, 286). A questionnaire completed by S.A.N.'s kindergarten teacher specifically reports no problems in this domain. (Tr. 148). As was the case above, there is also ample medical evidence to substantiate the ALJ's finding. Pursuant to her examination of S.A.N. on March 2, 2010, LaFountain observed that, while S.A.N. exhibited some aggression towards others, her mood and affect were bright and engaging. (Tr. 167). Treatment notes from Weldon indicate that S.A.N. behaved and interacted well. (Tr. 216, 218, 220, 222, 224, 226, 229). On August 11, 2011, Dr. Chapelle found S.A.N. to be cooperative and motivated to perform up to potential. (Tr. 287). Testing at this time suggested that S.A.N.'s understanding of commonly expected social

behaviors and of the rationale for those expectations and those behaviors was in the average range. (Tr. 288).

As stated above, to the extent there are conflicts in the record evidence, it is up to the ALJ, not this Court, to resolve such issues. 42 U.S.C. § 405(g); <u>Seavey</u>, 276 F.3d at 10.

IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Docket #11) is DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #16) is ALLOWED.

<u>/S/ David H. Hennessy</u>
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE